# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT C. WILLIAMS,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>GERARDO ALCALA, et al.,<br><br>　　　　Defendants. | Case No. 1:17-cv-00916-DAD-SAB (PC)<br><br>ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT<br><br>[ECF No. 87] |

Plaintiff Robert C. Williams is appearing pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983. Both parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c)(1). (ECF No. 90.)

Currently before the Court is Defendants' motion for summary judgment, filed July 11, 2019.

**I.**

**RELEVANT BACKGROUND**

This action is proceeding on Plaintiff's claim of excessive force under the Fourteenth Amendment against defendants Alcala and Garza.[1]

On December 15, 2017, Defendants filed an answer to the complaint.

On December 21, 2017, the Court issued the discovery and scheduling order.

---

[1] Contrary to Plaintiff's contention, his claim is governed by the Fourteenth and not Eighth Amendment because he was a civil detainee at the time of the incident.

1

After an unsuccessful settlement conference, the Court issued an amended discovery and scheduling order on July 20, 2018.

As previously stated, on July 11, 2019, Defendants filed a timely motion for summary judgment. Plaintiff filed an opposition on July 29, 2019, and Defendants filed a reply on August 5, 2019. Therefore, Defendants' motion is deemed submitted for review without oral argument. Local Rule 230(l).

## II.

## LEGAL STANDARD

Any party may move for summary judgment, and the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) (quotation marks omitted); Washington Mut. Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011). Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1) (quotation marks omitted). The Court may consider other materials in the record not cited to by the parties, but it is not required to do so. Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001); accord Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).

In judging the evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, Soremekun, 509 F.3d at 984 (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d at 942 (quotation marks and citation omitted).

///

///

# III.
# DISCUSSION

## A. Summary of Plaintiff's Complaint

On October 26, 2015, Plaintiff was involved in an altercation with another patient, Corey Bell. (Compl. 4, ECF No. 1.) About fifteen minutes later, Plaintiff and Bell had a second altercation. (Id.) During this second altercation, Plaintiff took a swing at Bell, but missed hitting him and there were no punches thrown. (Id. at 4-5.) Plaintiff and Bell were wrestling on the ground and Plaintiff contends that Bell had both hands on Plaintiff's throat and was violently squeezing while Plaintiff had his hands on Bell's wrist attempting to get Bell's hands off Plaintiff's throat. (Id. at 5.) Officers Alcala and Garza arrived and it should have been clear to them who the aggressor was. (Id.) The two officers sprayed two cans of pepper spray on Plaintiff, and only Plaintiff, blinding him for ninety seconds. (Id.)

## B. Statement of Undisputed Facts[2]

1. On October 26, 2015, Plaintiff Robert Williams was detained at Coalinga State Hospital (CSH), now known as the Department State Hospital-Coalinga, and was housed in Unit 9. (Pl.'s Resp. to Req. for Admis. 1-2, Esquivel Decl. Ex. A.)

2. On October 26, 2015, Defendants Alcala and Garza were sworn peace officers with the Department of Police Services (DPS) at CSH. As peace officers, they were responsible for providing security at CSH, supervising patients, and responding to alarms related to unlawful conduct or disturbances. They were authorized to utilize various use-of-force options (that included physical strength and holds, pepper spray, and expandable baton) to stop an attack, overcome resistance, affect an arrest, or gain compliance with a lawful order. (Alcala Decl. ¶¶ 1-3; Garza Decl. ¶¶ 1-3.)

///

---

[2] Plaintiff did not comply with Local Rule 260(b) by reproducing the itemized statement of undisputed facts and failed to admit or deny those facts. However, Plaintiff did submit his own statement of what he considers to be the undisputed facts, and Defendants have filed a response. Defendants object to Plaintiff's statement of undisputed facts because he has failed to cite or refer to any evidence to support the purported facts and merely signed his opposition under penalty of perjury. Nonetheless, Defendants have provided a specific response to the facts as undisputed, undisputed but immaterial, and/or disputed. The Court has reviewed Plaintiff's statement of undisputed facts and will include only those facts that are truly undisputed and material to the instant motion.

1    3.      In the early evening of October 26, 2015, Plaintiff was involved in two physical altercations with patient Corey Bell in the Unit 9 dayroom. (Compl. at p. 4, ¶ 3, ECF No. 1; Esquivel Decl. Ex. B, Incident Report at 1-7.)

4.      Alcala and Garza were not involved in the first altercation between Plaintiff and Bell, but responded to the alarm that was sounded as a result of the first incident, and they remained in the unit pending the investigation into that incident. (Pl.'s Resp. to Req. for Admis. 6-7; Alcala Decl. ¶ 4; Garza Decl. ¶ 4; Esquivel Decl. Ex. D, Pl.'s Dep. 50:19-51:19.)

5.      Plaintiff suffered a broken nose as a result of the first altercation with Bell. (Pl.'s Resp. to Req. for Admis. 5; Pl.'s Dep. 51:20-22.)

6.      After the first altercation, Plaintiff returned to his room in Unit 9, and gathered a sock with eight "D" size batteries in it. (Pl.'s Resp. to Req. for Admis. 9; Pl.'s Dep 52:2-11; Incident Report at 6.)

7.      While in his room, Plaintiff saw Bell in the hallway, walking towards the dayroom. (Pl.'s Dep. 52:20-53:15.)

8.      About twenty minutes after the first altercation, around 5:23 p.m., Plaintiff returned to the dayroom, and walked over to the telephone booth that Bell was using. (Pl.'s Resp. to Req. for Admis. 12-13; Incident Report at 20-23; Esquivel Decl. Ex. C, Video Footage at 0:15-0:23.)[3]

9.      While in a sitting position, Bell kicked in Plaintiff's direction while Plaintiff was standing at the entrance of the telephone booth. Plaintiff swung the sock twice in Bell's direction inside the telephone booth. (Video Footage at 0:24-0:27; Incident Report at 20-23; Pl.'s Dep 55:17-56:14.)

10.     After Bell kicked at Plaintiff, Plaintiff and Bell grappled with each other against the wall and window next to the telephone booth before falling to the floor. (Pl.'s Resp. to Req. for Admis. 17; Video Footage at 0:27-0:32; Incident Report at 20-23; Pl.'s Dep. 56:17-57:3.)

///
///

---

[3] The times cited for the video footage are based on the Windows Medical Player counter.

4

11. Alcala and Garza, who were in the Nurse's Station, heard someone yell words to the effect that Plaintiff and Bell were fighting again, and they responded to the dayroom along with other staff members. (Alcala Decl. ¶¶ 5-7; Garza Decl. ¶¶ 5-7; Video Footage at 0:31-0:38; Incident Report at 5.)

12. When Defendants entered the dayroom, they saw Plaintiff and Bell fighting against the wall between the telephone booth and the ice machine. They were on their feet and appeared to be hitting each other with closed fists. Staff were attempting to separate them. (Alcala Decl. ¶ 8; Garza Decl. ¶ 8; Video Footage at 0:31-0:38.)

13. Defendants identified themselves as DPS police officers and shouted several orders at Plaintiff and Bell to stop fighting and to break it up. But the patients continued to strike each other with closed fists as they fell to the floor, where they continued fighting and wrestling. (Alcala Decl. ¶ 9; Garza Decl. ¶ 9; Video Footage at 0:31-0:38; Pl.'s Resp. to Req. for Admis. 19; Incident Report at 5.)

14. Several staff members attempted to separate Plaintiff and Bell when they fell to the floor, but were unsuccessful. (Garza Decl ¶ 10; Video Footage at 0:31-0:38.)

15. Defendants and other staff were repeatedly yelling orders for the patients to stop fighting to no avail. (Alcala Decl. ¶ 10; Garza Decl. ¶ 10; Incident Report at 5.)

16. Defendants determined that Plaintiff and Bell were not going to stop fighting, and they readied their pepper spray. Before deploying any pepper spray, they again identified themselves as DPS police, ordered the patients to stop fighting, and yelled "pepper spray" multiple times to no avail. (Alcala Decl. ¶¶ 10-12; Garza Decl. ¶¶ 11-12; Incident Report at 5.)

17. From approximately four to five feet from the patients, each Defendant dispersed a two-to-three-second burst of pepper spray in the facial areas of Plaintiff and Bell. (Alcala Decl. ¶ 13; Garza Decl. ¶ 13; Video Footage at 0:38-1:02; Incident Report at 5.)

18. The pepper spray appeared to have no effect, and Plaintiff and Bell continued fighting. (Alcala Decl. ¶ 13; Garza Decl. ¶ 13; Incident Report at 5; Video Footage at 0:38-1:02.)

19. Defendants again yelled at Plaintiff and Bell to stop fighting, but they continued to fight on the floor. (Alcala Decl. ¶¶ 14, 17; Garza Decl. ¶¶ 14, 16; Incident Report at 5.)

20.     About ten to fifteen seconds later, Defendants deployed another two-to-three-second burst of pepper spray into the facial area of Plaintiff and Bell, with negative results.  (Alcala Decl. ¶¶ 15-16; Garza Decl. ¶¶ 14, 28; Incident Report at 5; Video Footage at 0:38-1:02.)

21.     While Garza continued to yell commands at Plaintiff and Bell to stop fighting, Alcala deployed his expandable baton.  Alcala ordered for the patients to stop fighting and yelled "baton." (Alcala Decl. ¶¶ 18-19; Garza Decl. ¶ 16; Incident Report at 20; Video Footage at 0:38-1:02.)

22.     Before Alcala used the baton, Officer McGee ran behind Plaintiff and Bell and pulled Plaintiff by the foot and away from Bell as Bell was separating himself from Plaintiff.  (Alcala Decl. ¶ 20; Garza Decl. ¶ 17; Video Footage at 1:02-1:09; Incident Report at 5; Pl.'s Dep. 76:20-77:21.)

23.     Once separated, Plaintiff and Bell stopped fighting.  They were handcuffed and escorted out of the dayroom for decontamination and medical assessment.  (Alcala Decl. ¶¶ 21-23; Garza Decl. ¶¶ 18-19; Video Footage at 1:09-2:08; Incident Report at 5-6; Pl.'s De. 84:7-85:17; Esquivel Decl. Ex. E, Medical Records at 1.)

24.     Defendants had no further interaction with Plaintiff once he was escorted out of the Unit 9 dayroom.  (Alcala Decl. ¶ 23; Garza Decl. ¶ 19.)

25.     The entire incident lasted about two minutes from the time Defendants responded to the dayroom to the time Plaintiff and Bell were escorted out of the room.  (Alcala Decl. ¶ 25 (stating that incident lasted about one minutes from time he responded to the dayroom to the time the patients separated); Garza Decl. ¶ 20; Pl.'s Dep. 71:9-72:2 (testifying that it was "second" from the time he fell down to the time he felt being pepper sprayed).)

26.     Officer Munoz's report summarizes the statements of five Psych Techs that he interviewed following the altercation.  (Pl. Stmt. of Undisputed Facts No. 3; ECF No. 92.)

27.     Psych Tech Chase stated that he did not see any punches being thrown.  (Pl. Stmt. of Undisputed Facts No. 8; ECF No. 92.)

28.     Officer Munoz's report summarizes what he saw on the video footage.  (Pl. Stmt. of Undisputed Facts No. 9; Video Footage at 0:41-0:43.)

29.     Psych Tech Casanova attempted to separate Plaintiff and Bell from wresting on their feet against a window with negative results.  (Pl. Stmt. of Undisputed Facts No. 17.)

30. Defendants dispersed a total of four bursts of pepper spray-two each. (Pl. Stmt. of Undisputed Facts Nos. 20-21.)

31. Soon after the second altercation ended, Plaintiff was evaluated by medical staff. He did not mention being in pain, experiencing a burning sensation, or otherwise complain about being pepper sprayed. (Medical Records at 1.)

32. Between October 26 and October 29, 2015, Plaintiff was regularly seen and evaluated by medical staff. He did not complain of a burning sensation on his facial area or pain caused by the pepper spray. The only pain he complained of was related to his broken nose. (Medical Records at 2-40.)

33. Defendants caused Plaintiff only de minimis injuries. (Pl. Stmt. of Undisputed Facts No. 34.)

34. Plaintiff was subsequently arrested for, charged with, and convicted of assault with a deadly weapon on Bell as a result of the second altercation. (Pl.'s Resp. to Req. for Admis. 48-50; Incident Report at 26-27; Medical Records at 40.)

35. Plaintiff admits that he felt being pepper sprayed twice. (Pl.'s Dep 72:21-23; 76:7-10; Pl.'s Resp. to Req. for Admis. 28, 32.)

36. During the physical altercation with Bell, Plaintiff did not see who entered the dayroom, when Defendants entered the dayroom, who pepper sprayed him, or who else may have been pepper sprayed, and he did not hear anyone yelling for him to stop fighting or shouting other commands or comments. (Pl.'s Dep. 66:19-67:10; 70:20, 73:11-15, 74:15-75:1, 75:21-76:2.)

37. At no time during the physical altercation did Defendants have reason to believe that Plaintiff was the victim, nor did they see Plaintiff incapable of defending himself or at a disadvantage. Defendants did not hear Plaintiff cry out for help or take a submissive or defensive position that would have indicated to Defendants that he was unable to protect himself from Bell. Both patients were throwing punches at each other the entire time Defendants saw them fighting, and they appeared to be involved in mutual combat. (Alcala Decl. ¶ 27; Garza Decl. ¶ 22; Video Footage; see generally Incident Report at 1-23.)

///

38. At no time during the physical altercation did Defendants have reason to believe that Plaintiff was the victim, nor did they see Plaintiff incapable of defending himself or at a disadvantage. Defendants did not hear Plaintiff cry out for help or take a submissive or defensive position that would have indicated to Defendants that he was unable to protect himself from Bell. Both patients were throwing punches at each other the entire time Defendants saw them fighting, and they appeared to be involved in mutual combat. (Alcala Decl. ¶ 17; Garza Decl. ¶ 22; Video Footage; see generally Incident Report at 1-23.)

39. Based on their experience and the events they encountered, Defendants determined that using pepper spray was the only reasonable use-of-force option available to them to stop the fight between Plaintiff and Bell. (Alcala Decl. ¶¶ 28, 33; Garza Decl. ¶¶ 23, 28.)

40. Physical strength or holds was not a reasonable use-of-force option to quell the fight because Defendants did not know if either patient had a weapon, and they risked having one or both patients turn their aggression towards them if they jumped into the brawl. Once Plaintiff and Bell were fighting on the floor, Defendants risked getting pulled down to the floor or caught in the ruckus, or rendering a patient defenseless if the Defendants physically intervened. (Alcala Decl. ¶¶ 29-30; Garza Decl. ¶¶ 24-25.)

41. Although the expandable baton was available to Defendants, the baton was not a reasonable option as an initial response because the sudden and unexpected movements of Plaintiff and Bell as they fought, created a substantial risk that Defendants would miss their intended target and cause greater harm. (Alcala Decl. ¶ 31; Garza Decl. ¶ 26.)

42. Waiting for Plaintiff and Bell to stop fighting on their own volition was not an option for Defendants. The patients were striking each other with closed fists, risking serious injury or possible death if a blow landed "just right." Defendants did not know if either one had a weapon. Also, the fight could have been a distraction or decoy for other unlawful activity, or an opportunistic patient could have engaged in unlawful acts elsewhere, in the unit given that many staff members responded to the incident, leaving other areas of the unit with minimal supervision. Thus, it was imperative that Defendants stop the fight immediately and restore order to the unit. (Alcala Decl. ¶ 32; Garza Decl. ¶ 27.)

8

**C. Analysis of Defendants' Motion**

Defendants argue that they used objectively reasonable force to stop the fight and gain Plaintiff's compliance with their law orders to stop fighting. In the alternative, Defendants argue they are entitled to qualified immunity because they did not violate Plaintiff's constitutional rights, and their conduct was reasonable under the circumstances.

The Due Process Clause of the Fourteenth Amendment protects civil detainees from the use of excessive force which amounts to punishment. Gibson v. County of Washoe, Nev., 290 F.3d 1175, 1197 (9th Cir. 2002). An excessive force claim brought by a person, confined in a state institution, who is not a "prisoner" subject to punishment, should be evaluated under the objective reasonableness standard of the Fourteenth Amendment as applied to excessive-force claims brought by pretrial detainees, and not under the Eighth Amendment excessive-force standard. Andrews v. Neer, 253 F.3d 1052, 1061 (9th Cir. 2001). This due process standard recognizes that the state is entitled to hold such a person in custody and that the detainee's confinement raises "concerns similar to those raised by the housing of pretrial detainees, such as the legitimate institutional interest in the safety and security of guards and other individuals in the facility, order within the facility, and the efficiency of the facility's operations." Andrews v. Neer, 253 F.3d at 1061 (citing Johnson-El v. Schoemehl, 878 F.2d 1043, 1048 (8th Cir. 1989)). The inquiry is whether Defendants' actions were objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. See Kingsley v. Hendrickson, 135 S. Ct. 2466, 2473 (2015) (This determination is to be made "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight."); see also Lolli v. County of Orange, 351 F.3d 410, 415 (9th Cir. 2013).

The Court can consider various factors in evaluating the reasonableness which may include: (1) the relationship between the need for the use of force and the amount of force used; (2) the extent of plaintiff's injury; (3) any effort made by the officer to temper or to limit the amount of force; (4) the severity of the security problem at issue; (5) the threat perceived by the officer; and (6) whether the plaintiff was actively resisting. Kingsley v. Hendrickson, 135 S.Ct. at 2473 (citing Graham v. Connor, 490 U.S. 386, 396 (1989)). "[T]he most important *Graham* factor is whether the suspect posed an

immediate threat to the safety of the officers or others." Mattos v. Agarano, 661 F.3d 433, 441 (9th Cir. 2011) (internal quotation marks and citation omitted).

In conducting the reasonableness analysis, the Court must "examine the totality of the circumstances and consider 'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*.'" Bryan v. MacPherson, 630 F.3d 805, 826 (9th Cir. 2010) (citation omitted). In sum, the operative question is whether the officer's actions were objectively reasonable in light of the facts and circumstances. Graham v. Connor, 490 U.S. at 397. Furthermore, the objective reasonableness of an officer's use of force must be judged from the perspective of a reasonable officer on the scene, "rather than with 20/20 vision of hindsight." Id. at 396.

1. Relationship Between the Need for Use of Force and Amount of Force Used

The undisputed evidence demonstrates that Plaintiff and Bell were fighting uncontrollably and striking each other with closed fists in the dayroom. The second altercation took place only twenty minutes after the first fight and Defendants, who were assigned to other housing units, were still in Unit 9 investigating the first incident.[4] Plaintiff and Bell ignored staff's orders to stop fighting, and the two continued to pummel each other even after they fell to the ground. When Defendants arrived in the dayroom, they saw Plaintiff and Bell hitting each other with closed fists, and continued hitting each other while on the floor. (Alcala Decl. ¶ 8; Garza Decl. ¶ 8; Video Footage at 0:31-0:38.) Each From approximately four to five feet away, Defendant dispersed two short, two-to three-second bursts of pepper spray into the facial areas of Plaintiff and Bell, only after Plaintiff ignored the repeated orders to stop fighting and warning that pepper spray would be used. However, the pepper spray did not appear to have any impact, and the patients continued fighting. Defendants again yelled for them to stop to no avail. Then, approximately ten to fifteen seconds after the first burst of pepper spray, Defendants deployed another two- to three-second burst of pepper spray into the facial areas of both Plaintiff and Williams, with negative results. Garza continued to yell for the patients to stop fighting,

---

[4] The first altercation is not at issue in the present action. In addition, Defendants Alcala and Garza were not involved in the first altercation, but responded to the alarm that was sounded as a result of the first incident, and they remained in the unit pending the investigation into that incident. Furthermore, Plaintiff is not proceeding on a claim of retaliation. Indeed, the Court has already determined that Plaintiff's allegations about the October 21, 2015 events are irrelevant to this action and any claim for retaliation fails absence evidence of Defendants' knowledge of those earlier events. (ECF No. 59, 65.)

10

while Alcala deployed his expandable baton. Alcala ordered for Plaintiff and Bell to stop and yelled "baton." Before Alcala used the baton, officer McGee ran behind Plaintiff and Bell and pulled Plaintiff by the foot and away from Bell as Bell was separating himself from Williams. After the two were separated, they stopped fighting and were handcuffed and escorted out of the dayroom for decontamination and medical assessment.

Defendants submit that pepper spray was the only reasonable use of force option because physical strength or holds was not a reasonable option to quell the fight because the Defendants did not know how the fight started, why the patients were fighting, or whether one of them had a weapon. (Alcala Decl. ¶¶ 29-30; Garza Decl. ¶¶ 24-25.) Further, injecting themselves into the fight posed a substantial risk of serious bodily injury to the officers had the patients turned their aggression towards Defendants of if the patients had a weapon. (Id.) Also, using a baton as an initial response was not reasonable because Plaintiff and Bell were moving suddenly and unexpectedly during the right, such that the movement created a substantial risk that Defendants may miss their intended target. (Alcala Decl. ¶ 31; Garza Decl. ¶ 26.) Moreover, using no force whatsoever was not an option because the Plaintiff and Bell were actively striking each other with closed fists, which created a substantial risk that someone may be seriously injured. (Alcala Decl. ¶ 32; Garza Decl. ¶ 27.)

Plaintiff argues that officer Munoz's report of what he saw on the video footage gives rise to an inference that no punches were thrown, and none of the pysch techs interviewed by Munoz reported seeing punches being thrown. However, a review of the video footage demonstrates otherwise as it appears to show that someone is throwing punches. (Video Footage at 0:41-0:43.) Therefore, the fact that none of the psych techs interviewed by Munoz did not see or known whether punches were thrown does not raise a genuine issue of material fact that Defendants Alcala and Garza saw punches being thrown, which is consistent with the video footage of the altercation. (See Video Footage at 0:41-0:43 (depicting right elbow of patient on top raising and falling several times).)

In addition, Plaintiff's argument that he was the only one who was pepper sprayed four different times is not supported by the evidence. In fact, Plaintiff testified at this deposition that he felt he was pepper sprayed two times. Further, Plaintiff does not dispute that nurse Celestine reported that

1  Bell was exposed to pepper spray, which is consistent with Defendants' account that they pepper
2  sprayed both patients.
3      The Court finds that Plaintiff has not presented evidence from which a rational jury could find
4  the force applied to him was in excess of what would have been reasonable under the circumstances.
5  Based on a review of the video footage of the incident, along with the obvious threat to the safety and
6  security of the institution, the minimal amount of force used by Defendants Alcala and Garza was not
7  objectively unreasonable.

    2.    Extent of Plaintiff's Injury

The Court may consider the severity of injuries in evaluating the amount of force used. Falarca v. Birgeneau, 819 F.3d 809, 817 (9th Cir. 2018) (evaluating excessive force claim under the Fourth Amendment reasonableness standard). The Court may infer from the minor nature of a plaintiff's injuries that the force applied was minimal. Id. "While injuries are not a precondition to section 1983 liability, their absence can suggest a lesser degree of force when that force is the type likely to cause injuries." Id.

Plaintiff admits that he suffered only de minimis injuries by Defendants. The entire incident lasted approximately two minutes from the time Defendants responded to the dayroom to the time that Plaintiff and Bell were escorted out of the room. Immediately following the incident, Plaintiff was decontaminated and evaluated by medical staff. Plaintiff did not complain of pain or having a burning sensation in the days following the incident, and he only complained of pain from his broken noise as a result of the first altercation.

However, Plaintiff contends, without evidentiary support, that he suffered a chemical burn. Plaintiff has not submitted any medical evidence to support his assertion that he suffered a chemical burn, and Plaintiff cannot testify to such medical determination. Fed. R. Evid. 701, 702. Further, Defendants' objection to the submission of Dr. Pyo's psychiatric report is sustained because it is inadmissible hearsay, lacks foundation, and is irrelevant. First, the report is dated February 5, 2018, over two years after the altercation at issue in this action. Second, the report is incomplete as Plaintiff submitted only the odd pages. Third, Dr. Pyo did not determine that Plaintiff's post-traumatic stress disorder was caused by Defendants' use of pepper spray as opposed to several other traumatic events

that Plaintiff experienced, including but not limited to his eleven suicide attempts (all but one took place prior to the altercation at issue here) and witnessing the death of a peer. (Pl. Opp'n at 13-15, ECF No. 92.)

### 3. Effort Made by Defendants to Temper or Limit Amount of Force

It is undisputed that Defendants and other staff members repeatedly and continually shouted commands for Plaintiff and Bell to stop fighting, but they ignored the orders and persisted in their mutual combat. Defendants therefore determined that Plaintiff and Bell were not going to stop fighting, and they prepared their pepper spray. Prior to utilizing the spray, they again identified themselves as DPS officers, ordered them to stop fighting, and yelled "pepper spray" multiple times to no avail. Defendants dispersed a two- to three-second burst of pepper spray from approximately four to five feet at the facial areas of Plaintiff and Bell. However, the pepper spray did not appear to have any impact, and the patients continued fighting. Defendants again yelled for them to stop to no avail. Then, approximately ten to fifteen seconds after the first burst of pepper spray, Defendants deployed another two- to three-second burst of pepper spray into the facial areas of both Plaintiff and Williams, with negative results. Garza continued to yell for the patients to stop fighting, while Alcala deployed his expandable baton. Alcala ordered for Plaintiff and Bell to stop and yelled "baton." Before Alcala used the baton, officer McGee ran behind Plaintiff and Bell and pulled Plaintiff by the foot and away from Bell as Bell was separating himself from Williams. After the two were separated, they stopped fighting and were handcuffed and escorted out of the dayroom for decontamination and medical assessment.

### 4. Severity of the Security Problem at Issue and Threat Perceived by Defendants

It is undisputed that Plaintiff and Bell were fighting in the dayroom. It is also undisputed that Defendants responded to the dayroom to assist in putting an end the patients' fight. As stated above, before application or force, Defendants and CSH staff made repeated efforts to separate Plaintiff and Bell, by trying to physically intervene and ordering them to stop. However, the patients' disruptive behavior continued and posed an immediate threat to them and staff. Indeed, the presence of weapons was unknown, and the fight diverted the attention of staff to the dayroom which created a risk of other unlawful activity elsewhere in the unit. Defendants had a legitimate interest in restoring order to the

13

housing. Although Defendants did not witness the first altercation, they responded to the alarm which produced a mass response from staff and disrupted programming in the housing unit. The second altercation also disrupted the programming and services in the housing unit because staff were diverted to assist in quelling the fight. Plaintiff and Bell were striking each other with closed fists, risking serious injury or possible death if a blow landed "just right." In addition, Defendants did not know if either patients had a weapon. Furthermore, the fight could have been a distraction or decoy for other unlawful activity, or an opportunistic patient could have engaged in unlawful acts elsewhere, in the unit given that several staff members responded to the incident, leaving other areas of the unit with limited supervision. (Alcala Decl. ¶ 32; Garza Decl. ¶ 27.)

        5.     <u>Whether Plaintiff was Actively Resisting</u>

Plaintiff argues that he was the victim of the assault, and Defendants should have been aware of such fact. However, Plaintiff has failed to present any evidence to support a finding that Defendants were aware that Bell was the aggressor, even if it were true. Further, Plaintiff did not see when Defendants entered the dayroom, and he does not know what the officers saw when they came upon the scene. Defendants did not see that Plaintiff was incapable of defending himself or at a disadvantage. Indeed, Defendants never heard Plaintiff cry out for help or take a submissive or defensive position. Furthermore, both patients were throwing punches at each other the entire time Defendants were attempting to stop the fight. Moreover, Plaintiff's contention is belied by his subsequent conviction for assaulting Bell with a deadly weapon and the video footage of the incident demonstrates that he followed Bell into the dayroom, attacked him with a battery-filled sock, and Bell defended himself by kicking Plaintiff and then grappling with him.

///
///
///
///
///
///
///

## IV.
## ORDER

Based on the foregoing, it is HEREBY ORDERED that:

1. Defendants' motion for summary judgment is granted; and
2. The Clerk of Court shall enter judgment in favor of Defendants.

IT IS SO ORDERED.

Dated: **August 21, 2019**

_____
UNITED STATES MAGISTRATE JUDGE